The next case, No. 221795 and No. 221796, American Trucking Associations, Inc. v. Rhode Island Turnpike and Bridge Authority and Peter Alviti, Jr. At this time, would counsel for the Rhode Island Turnpike and Bridge Authority at all please introduce himself on the record to begin. Good morning, Your Honors, and may it please the Court, Ian Gershengorn for Appellant State of Rhode Island. With the Court's permission, I'd like to reserve four minutes for rebuttal. Four minutes, yes. Thank you, Your Honor. Rhode Island's legislature imposed a facially neutral toll on the biggest trucks that caused the most damage to Rhode Island's transportation infrastructure. In striking down the legislation, the District Court misapplied the Commerce Clause and it took for itself decisions that belonged to the state's elected representatives. Both of the District Court's principal conclusions were wrong for reasons I'd like to outline at the start before digging in more deeply. First, the Court held that the tolls are discriminatory, but RoadWorks imposes frequency-based tolls that treat both in-state and out-of-state drivers the same. The case law reflects the Commerce Clause core concerns of stopping economic protectionism and preventing balkanization, but there's no concern about economic protectionism because the District Court itself found that there's no evidence that smaller trucks and big trucks compete and no evidence that the tolls give in-state competitors an advantage over out-of-state competitors who use big trucks. And there's no concern about balkanization because, as this Court recognized in Doran, tolls like these raise none of the concerns raised by things like flat taxes, mud flaps, or other roadblocks on entry to the state. Mere disparate impact in favor of in-state residents is not discrimination in the constitutional sense. Second, the District Court held that RoadWorks tolls do not fairly approximate the bridge use of tractor-trailers, but tolls based on actual usage are the paradigmatically fair way to structure user fees, and the Legislature's decision to put a use-based toll on the biggest rigs that cause the most damage was not wholly unreasonable or wholly irrational, which as the standard this Court applies. Counsel, may I ask you a question? You agree that if there is discriminatory effect, there's still strict scrutiny. Correct, Your Honor. In the relevant sense, yes. Can you help me understand the difference between discriminatory effect and disparate impact, as you have argued it, and it would be incredibly helpful if you could point to an effect that you think is discriminatory versus what you say here, which is just disparate impact that you think is not actionable. Sure, Your Honor. The major difference as we see it is that mere disparate impact without a finding of competition, an impact on competition, is insufficient. So a case like Doran is the perfect example. There there was a clear disparate impact on in-state residents. It helped in-state residents. But there was no impact on competition, on interstate versus out of, in-state versus out-of-state competition. That's what this Court has held over and over and over again. It's Doran, it's Cherry Hill, and it's Traylor Bridge, and it's the Supreme Court cases in Exxon and in General Motors versus Tracy. Are you saying that competition, regardless of what the actual facts are, competition is what makes that discriminatory effect, which is actionable, versus disparate impact, which isn't? Correct. I'm saying that's a necessary condition, Your Honor. And that's what Doran held. What Doran said was that Massachusetts residents bought the overwhelming majority of the transponders. In fact, Connecticut residents had a couple of thousand. That's what this Court said in Cherry Hill, and that's what the Supreme Court said in Exxon v. Maryland, where, of course, the legislation affected only out-of-state people. And it has to be that way, because if you think about it, the legislature acts all the local concerns is the core of what legislatures do. And we pointed out some things in our brief, for example, that T-pass, season passes to New Hampshire parks, off-peak fares for main ferries, all of those things have disparate impact on in-state residents, but they don't have the requisite impact on competition. Counsel, excuse me, are you saying that the district court spent a lot of time with a kind of mathematical analysis showing that given the frequent use of local truckers of these bridges, given the cap that they could then take advantage of, that there was a significant difference between sort of the cost per mile of these tolls on the interstate truckers and the local truckers? The Court demonstrated that and said that that mathematical demonstration, if you will, reveals the discriminatory effect of what's going on here. Are you saying that that was just a large irrelevancy, that that simply should not factor in to the dormant Commerce Clause analysis? So, Your Honor, I am saying that given the findings the district court made, and I think it's worth it, this goes to, I think, the heart of the case from our perspective, and this is on the addendum, the district court's opinion of 87 to 88. Here are the key findings that the district court made with respect to competition. He said plaintiffs did not put forth any concrete evidence demonstrating an increase in Rhode Island-based companies' use of untold trucks, changes in vehicle fleets, diversion, or any other data demonstrating that lower-class trucks compete in the same market as local trucks. He also said plaintiffs put forth no evidence that in-state competitors have gained a competitive advantage at the expense of out-of-state competitors that use class-A trucks. And the Court said that's not legally required. No, no. I'm saying that's exactly the legal requirement he had to find, that there was, and he found actually against plaintiffs. He had to find an impact on competition, an effort to benefit in-state competitors at the expense of out-of-state competitors. And indeed, I think that's what follows naturally from the Supreme Court's decision in Michigan Public Service. If you think about that, that was a case where it clearly had a disparate impact, right? It was a flat fee on intrastate truck drop-offs. And what the Supreme Court said, it was no problem because that fee attaches only to activities taking place exclusively within the borders. It doesn't facially discriminate against interstate or out-of-state activities. It applies even-handedly to all carriers that make domestic journeys, and it does not reflect an effort to tax activity that takes place in whole or in part outside the state. The Court did do what it characterized as an internal consistency analysis, and it suggested that if other states did what Rhode Island did, it gave a kind of hypothetical. It demonstrated how it might incentivize truckers to limit their activity to trucking within the borders of a state. And they, by doing that, then they could avoid these tolls that he used the Pennsylvania, Ohio, Indiana example, and I think was making an internal consistency is an important issue in the analysis, and I think the point was that if you, again, if all states do this, you are going to affect behavior. Was that an appropriate analysis? So, Your Honor, I think it was an appropriate analysis, but he did it wrong. There is a separate part of the Dormant Commerce Clause, which we agree with, which is that roadblocks on entry into a state, like a flat tax, like a requirement of mudflaps in the Supreme Court decision in Thib, where you are, you're putting a barrier at the state itself is an impediment to interstate commerce, and so we agree with that. But this case does not implicate any of those things. This is not a tax at the border for coming in. What this is, is much like Jefferson Lines, the Supreme Court case, where the court said, you can tax something as it moves state to state to state for the things that happen inside the state. And, of course, that's exactly what is happening here. So you've got, in a way, in an odd way, we've got sort of two cases here. One is the decision to tax only Class 8 and over vehicles. And then the second are the caps that are put in place. With respect to the caps, to simplify it some, suppose Rhode Island just said $15 each time to go over one of these 13 bridges, but it's capped at $35. How would that be any different than the arrangement in Trailer Marine? So, Your Honor, I think it's fundamentally different in this way. These are caps that reset every day. And so unlike Shiner and unlike Trailer Marine, which are annual caps, these are use-based in the corest sense of the word. So that if you come into Rhode Island, or you're in Your Honor's hypo, can I use $40 because my math is acute to that, instead of $35, if you come in once a month and you hit the cap, you pay $480 across the year. If you come in every day and hit the cap, you hit $14,600 for the year. It's usage-based in the corest way, in the way that Trailer Marine and Shiner were really not. And if you think about it, of course, it has to be that way. So it's the duration of the effect of the cap that you're distinguishing? No, Your Honor, no, that's not the only thing. Because the other big difference is that, of course, you don't pay anything for crossing into Rhode Island, right? And if you cross into Rhode Island, you're not triggered, no toll is triggered. If you never pass through a gantry, you never pay. If you pass through one gantry, you pay once. If you pay through a second gantry, you pay twice. So it's fundamentally different than a sort of flat tax. And if you think about it, what Rhode Island has done is really no different than what happened in Duran. There are lots of ways to give frequency-based discounts. You can do what the legislature did in Duran. Counsel, I'm sorry to interrupt you, but this seems to me very different than Duran, and I want to take you back to discriminatory effect. Because I understand, of course, your argument that if you're class A and above, you get told the same amount, whether you're in-state or out-of-state. But it seems that there was a trial here. And what the district court concluded was that class A and above was just a proxy for discrimination. And what the state has done, if you take a step back, is it's chosen a category for tolling for this program, a category that's 80 percent out-of-staters. So I guess my question for you is, if Rhode Island had chosen a category that was 99 percent out-of-staters to toll for its RoadWorks program, are you saying that still wouldn't be enough to show discriminatory effect to get strict scrutiny? So, Your Honor, at some point, it becomes sufficient. And this court has held that in family winemakers, right? That's the family winemakers case. When every Massachusetts set up a system, every single one of the winemakers made it, the court said, of course, that's not facial, but it's basically a... So why is 80 percent? If 100 percent is enough, why is 80 percent not enough? It is clear from a couple of reasons, Your Honor. First of all, the benefits are not anywhere near as lopsided as something like that. The 60 percent of the benefits go to out-of-state truckers, even on plaintiff's numbers, right? Second, what the legislature was doing in the caps was tolling the heaviest trucks, right? That is something that's independent from the nature of the out-of-state truck, and the legislature is able to take that into account. And so I actually don't think what the district court was saying was that this is somehow really a perfect proxy for out-of-state trucks. This is a situation in which the legislature was clearly balancing a number of different objectives, right? It wanted to raise revenue, it wanted to prevent diversion onto state roads, and it wanted to stop sticker shock for the newly tolled individuals, and the legislation reflects that balance, right? So it imposes a toll, but it puts a cap on I-95, and it puts a daily cap, and it has a per-gantry, its own per-gantry cap. I agree with you that the legislature's decision to toll at Class 8 and above is critical, the critical fact in this case. So another question I have for you is what level of deference are we supposed to give that decision, and does the level of deference depend on whether we're in the discrimination prong versus the fair approximation use prong of the analysis? I think it does, Your Honor. I think candidly it does. I think in the fair approximation prong, it's wholly irrational or unreasonable is the test. I think in the discrimination prong, the court looks to see whether there was a discriminatory – two things, right? Whether there was a discrimination against out of – that benefits in-state competitors at the expense of out-of-state competitors, one. So back to the competition. Correct. Or that it creates a boundary akin to a flat tax or a mudflap or a tax on entry into the state. In no other situation has this court struck down or the Supreme Court struck down a state legislation on that effect. And again, I think it's really critical that the court – you know, there are these concerns that Your Honor is identifying. But when you look at the cases, right, Traylor Bridge talks about the need to show an impact on competition, right? So the question, I guess, is is there a finding, which I don't think the district court made, that this is like family winemakers, which sort of takes you – which is a way to take out – I give family winemakers as akin to facial discrimination but COFR, right? I don't think there's any serious argument that that's what this is. And so because the district court found no impact on competition, this is not like a flat tax. And because this is not remotely like family winemakers, I think you don't get to the discrimination. But counsel, the – I mean, the – well, if the caps were to go away, then the discriminatory effect issue would go away, right? I mean, that would – and you suggest that severance should be on the table, right? And if – I mean, the caps – I mean, the district court treated – that when the caps are triggered, it's just like a flat tax. And it seems to me that the district court was correct, that the cap does function like a flat tax once triggered. If the caps aren't there, then these discriminatory – I know we distinguish between, I guess, effect and impact. You seem to be saying, yeah, there's an effect, but there's no real impact in terms of – on competition. But just – if the caps go away, that would solve a lot of these problems, right? I agree with that. And we've argued in our brief. You should – Right. Second, Your Honor, though, I think it's absolutely critical that our position is that the caps do not function like a flat tax. Whether you structure something as an upfront fee and then discounted tolls the rest of the way as enduring, or you structure it as you pay once and you ride as many times as you like, it's like a commuter card, or you structure it as you pay the actual toll up to amount and then there's a cap. Those are all frequency – ways to give a frequency-based discount. The Constitution cannot – cannot be that the Constitution prefers one of those over  Second, unlike a flat tax, Your Honor, there is no tax on entry into the state. If you come into the state and don't drive through a bridge, you pay nothing. If you drive in the bridge and cross through one toll, you pay one toll. If you cross into the state and pay two tolls, you pay two tolls. And it's the same for in-state and out-of-state. The fact that there's a cap on the back end that resets every day, you come in the next day, you pay those tolls again, is crystal clear evidence that it is not a flat tax. Just because you reach a cap on a variable tax does not convert the entire tax scheme into a flat tax. I think that's crystal – that's – it's critically important. The Supreme Court – But why don't – it seems to me it does function like a flat tax. Once you hit that cap, I mean, the – the cost per mile of usage will be a huge difference between the local truckers who go back and forth and back and forth over these bridges and once they've hit the cap, they don't have to pay any more. And so they're getting a much bigger break from that cap than the trucker who just – who goes through the state, pays it once, and then goes on. Absolutely, Your Honor. But two points on that. Michigan Public Service, the Supreme Court upheld even though it was a flat tax. Why? Because it was on tribes' actions only in the state. It didn't create a barrier to entry and it applied evenly handed. So even if Your Honor thought that this was the functional equivalent of a flat tax, Michigan Public Service makes clear that this is okay.  Flat tax is triggered by, I dip my toe into the state, $200 for passing go. There is none of that here, right? You can come into Rhode Island and you will pay – you can pay nothing. You take Route 1. You take Route 3. Second, you can come in and cross one toll, two tolls. You can make an interstate delivery from Connecticut to Rhode Island. You don't have to go through the state. Yes, if you hit a cap, after that you don't pay anything and the cost per ride goes down. That is just the flip side of Doran, right? Doran is a big upfront fee and then you pay discounted fares the rest of the way. They are just mirror images of each other and it cannot be that the Constitution says it's okay for a state legislature to structure it as a big upfront fee and then discounted use, but the Constitution forbids you to say you pay the regular toll up to a cap and then after that cap you don't pay anything. Just like the Constitution doesn't care if you say you pay $100 and you can ride back and forth as many times as you want. Those are legislative judgments that the Supreme Court has said over and over, the Commerce Clause is not meant to displace. The Commerce Clause is meant to protect interstate competition and interstate commerce, the movement into the state. And so just the point on, Judge Lopez, on the internal consistency test. What makes this not a violation of the internal consistency test, just the way Doran wasn't and just the way Michigan Public Service wasn't, is that that is as applied to barriers to entry. What the court is worried about there is a $40 fee for coming into Rhode Island. Yeah, that violates internal consistency because then if Connecticut does it and Mass does it, all of a sudden you've got a war. There is no internal consistency for saying, for the time you're driving through my state, you have to pay along the way. In fact, that's what happens on tolls up all the way to Rhode Island. Well, suppose they said $40 fee for driving on any road in Rhode Island. So Your Honor, I think if they had a $40 daily fee I think is trickier, right? And that it is a trickier one precisely for the reasons Your Honor says, right? It's an entry fee at the border, but then it varies day to day. We think that's a close call and we think actually, but I think at the end of the day a fee to come into the state probably is no good, all right? But that is not remotely what's happening here. You can come in and out of Rhode Island all you want. If you drive Route 3 or Route 1, you never pay a toll. Even if you come up 95, you pull off after two exits, you pay the same tolls. You've made that point. Are there other questions for counsel? Thank you, Your Honor. Thank you. Thank you, counsel. At this time, counsel for the appellee would please introduce himself on the record to begin. Thank you, Your Honors. I'm Charles Rothfeld, Mayor Brown, representing the plaintiff's appellees. I think it's very helpful to take a step back and think about the consequences of the arguments that are being made by Rhode Island. The state takes the position that an intent to discriminate is irrelevant. Mr. Gershengorn took the position that kind of aggregate discriminatory effect is irrelevant. If that's true, then a state can decide, state officials can decide, we want to discriminate against businesses that are based out of state and get disproportionate benefits for the in-state competitors based in our state. And we can announce, they can announce that publicly, that this is our intent. They can instruct a state agency to come up with a facially neutral regime that inevitably will have the effect of imposing disproportionate burdens on out-of-staters benefiting in-state competitors. Well, but there'd be an effect on competition there, in what you just described. There would, and I guess here I think the position is they would agree with you then if there's an effect on competition, then there'd be a problem. Well, I have to take issue with my friend, Mr. Gershengorn, when he says that there is no effect on competition here. I guess in two respects. First of all, the citation that he offered the court on the addendum 8788, the district court there was talking only about the distinction between large and small trucks, not about the caps, not about the discriminatory effect on the tractor-trailers that are based in Rhode Island, compete with tractor-trailers based elsewhere. The district court did not suggest that there was any absence of competition there, and there clearly is competition. Even as for the large and small trucks, I think I also take issue with Mr. Gershengorn's characterization of the district court's finding. He didn't say that there was no competition. He said that it has not been established in the record, but it was irrelevant because there was potential competition there operating in the same market. He said it was speculative. Well, please, go ahead. He said it was, he dismissed the evidence and said it was speculative. As between large and small trucks. Right. Not between the two categories. That's right. So there's no doubt that there is a significant degree of competition between Rhode Islanders and out-of-staters, and the Rhode Islanders are benefited by the system. As among eight-plus trucks. As to eight-plus trucks. And, again, even as to the larger and smaller trucks, I think that the judge, Judge Smith, did not say that there isn't competition. He said that they kind of operate in the same market, that the plaintiffs had not established on the record that there was a competitive impact, but that it didn't matter because under the district court's holdings in trailer marine. Counsel, can I ask you about that, because I'm just looking at the addendum right now on page 88, and the court says, neither did the plaintiffs introduce any evidence that in-state competitors have gained a competitive advantage at the expense of out-of-state competitors that use class eight-plus trucks. So I just want to make sure I understood what you were saying about that. I think what he was saying there was the potential competition between the smaller trucks and the class eight trucks. But I guess I'll take a step back and say, even as to the question whether there must be proof of competitive injury, there need not be proof to establish a commerce court violation that there was actual in-the-market competitive injury. That's what this court held in the trailer marine case, and that's what the Supreme Court held in the Kamp's Newtown case. I think establishing from actual competitive impact would be extremely difficult. Well, in trailer marine, weren't they dealing with trailers versus trailers? They were, but I'm not sure. And so the court didn't require any expert testimony or the like when you get trailers versus trailers, which would go to your point here regarding the caps, which apply to trailers versus trailers. But as to the two different classes of trucks, with no evidence of competition, and it not being obvious that there is competition, the examples you give in your brief are cement trucks and dump trucks or something like that, it's hard to see how they compete with tractor trailers. We don't suggest that all small trucks compete with all large trucks, I think, but there clearly is a category of smaller trucks that do compete with larger trucks, and there was evidence to that effect by the plaintiff's expert jury. But again, I want to take a step back from that and say, if you look at the broader picture of what Rhode Island is arguing, they are suggesting, their theory is that, again, discriminatory intent is not relevant in their view, and aggregate discriminatory impact is not relevant in their view. And if that's true- Well, I don't think they say- I didn't understand them as saying they're not relevant. I understood them as saying they're not sufficient, and that if you have no effect on competition, then you've reduced asking whether there's a burden on interstate commerce. But I didn't see them- perhaps you have dealt with them more, but I didn't see them saying that those things are irrelevant. Well, I don't want to speak for the state. I took them to be arguing that aggregate discriminatory impact cannot establish a commerce clause violation because that would call into question the constitutionality of all kinds of innocuous legislation like progressive taxation and small business exemption. Sure, so it's not sufficient, is what they're saying. But I think that they don't address what makes it sufficient, and I think what makes it sufficient here are a couple of things. First of all, there is a discriminatory intent. And this court held in the Family Winemakers case, the Supreme Court said in the Raymond Motors case, that when there's an intent to discriminate, if nothing else, it kind of strips the state of law of any presumption of constitutionality, because it means that the ordinary political processes of the state are not going to protect out-of-staters. And we have here a factual finding. Can I ask you a question what you mean by that, actually, that it strips the statute of otherwise any presumption of validity? Because I'm just trying to understand what you mean there. Because if there's proof of discriminatory effect, strict scrutiny applies anyway, in which case you don't have a presumption of validity. So I'm just trying to understand what you meant by that argument. I think what we mean, Your Honor, is that even if one assumes that kind of de minimis disparate impact of the sort that Mr. Gershengorn is talking about is not sufficient by itself, that when you have discriminatory effect, and that's combined with discriminatory intent, that that takes the challenger over the hurdle and establishes unconstitutionality. Because if that's not the case, again, a state could say, we're going to set out to establish these rules that kind of have subtle discriminatory impacts. And it's going to be hard in any one case to demonstrate that this drug lost business. But over the course of time and over the course of all the entities that do business with the state, there is no doubt that that will happen. Well, how do you deal with, OK, say the Rhode Island legislature wants to pass a family medical leave act that's funded by the employers. And so they have a bill in the legislature, and it applies to all employers. And then legislatures start getting calls from small employers with three, four, five employees in their town saying, hey, this will really hurt us. So they say, we've listened to our local small employers, and we're going to make this bill so it only applies to employers with more than five employees. Most of which, but not all of which, but most of which are out-of-state corporations that have larger operations in the state. I think that that is different from our circumstances here. Well, would you agree that would not be a commerce clause violation? Probably not, depending on the extent. And yet you would have a disparate impact in that case, and you would have what you call evidence of discriminatory intent. And yet you would agree it's not a commerce problem. Well, I think that you would not have evidence of discriminatory intent in the sense that we have here. It's saying that we want to help our constituents. Our local constituents call up. So to help those, we're carving out something that we know will carve out most of the local companies. But the nature of the intent here, I think, is quite different. The intent here was not just that we want to cut our locals out from regulation that's going to hurt them. It's that we want to give them a competitive advantage over others. And what quote says we want to give them a competitive advantage? Well, I think there's no sort of quote on that, but I think the district court found— No one said that. They said what I had in my example, didn't they? I thought I kind of quoted what your evidence was of intent. Well, let me give you two answers to that, Your Honor. I mean, first, I think the district court found as a fact, and this is a factual inquiry, whether or not there was a discriminatory intent, that there was an intent of discrimination. And he found that based not only on the statements, which I recognize are not as expressed as they could be, but those were combined with the history and the structure of the legislation. Just as in the example I gave you. I tried to make the example. I'm not sure. How would you distinguish the example I gave you from the one that has you here before us today? Well, I think that the legislation that you're suggesting, Your Honor, is different kind of in its substance from Roadworks in at least two respects. One is that Roadworks fails the internal consistency test, and here I think that Judge Lopez is absolutely right, that in principle that Roadworks caps, at least, are exactly the same of what was going on in Shiner and in Travel Marine because the nature of the Roadworks legislation is that if every state adopted the Roadworks system, then necessarily entities that operate interstate will pay more just because they operate interstate. If you're a truck that drives the same number of miles, crosses the same number of bridges, and does it exclusively in one state, exclusively in Rhode Island, or you will pay less than if you do it in five states. And so it's no good. If it affects competition, it's no good. But what if it doesn't affect competition at all the way they're structured? Well, I think if you can establish definitively that it does not affect competition, I think we'd be in a different world. But all of these trucks operate in the same market. They're in the transportation market, as Judge Smith recognized in the pages of the indictment that Judge Riggleman was talking about. And so there's going to be at least potential competition, and that's what this Court talked about in the Travel Marine case. That's what even in the General Motors v. Casey case that my friend talks about. Counsel, this thought keeps recurring for me. I mean, we hear that the underlying concern with the kind of regulation that we have here is that it will sort of create balkanization, and it will affect the flow of goods from state to state. And yet there is no evidence in this record that any of those things are happening, that because of this particular scheme that it actually has affected or even will affect the conduct of business by interstate truckers. They may not like it. It may, in an aggregate sense, increase their costs. But there's no suggestion that it is going to diminish the flow of goods and trucks from state to state. There's just nothing in this record. The analysis seems highly theoretical, mathematical almost, but there's no evidence that it's going to have a real-world effect. Are you saying that that real-world effect on competition, on the flow of goods, that's just not necessary? I'm saying that there's no necessity for evidence of that. There was no evidence of that in China. There was no evidence of that in the Travel Marine. The Supreme Court and this Court have never insisted on an actual demonstration of harmful effects in the market because establishing that, again, when there are kind of these subtle discriminations, is almost impossible in any one case. And so I think this Court said clearly in Travel Marine, it's kind of the subtle effects that over time have an impact on entities that are engaged in interstate commerce. And over time, you degrade interstate commerce by doing that. You also create resentment between states, which is one of the principal concerns of the framers in putting commerce quotations in the Constitution. I mean, if Rhode Island does this and Massachusetts and Maine legislators perceive that this is going to give a competitive advantage to at least the large truckers in Rhode Island, as it certainly does, then they're not going to stand still for it. They will say, we're going to impose our own retaliatory systems and impose disproportionate burdens on Rhode Island truckers. And then it goes on and on and on. Counsel, if I might, we haven't spoken much at all about the distinction between the Class 7 and the Class 8 trucks. The district court wrote a long, thoughtful opinion. It's entirely commendable. But the one thing that puzzled me about this decision was that the court was so dismissive of this concept of use resulting in sort of the consumption of the resource, the notion that when heavier trucks cross a bridge, it will have a negative impact on the structure. And so it would be reasonable to assess a toll because of that impact. Why isn't that – this all goes to sort of the fair approximation. Are these tolls a fair approximation of cost? What's wrong with that concept of consumption? I just don't understand that. It seems to be so commonsensical that the heavier the truck, the greater the physical impact on the structure. So what's wrong with that, perhaps as a basis for distinguishing between the Class 8 and the Class 7 trucks? I'll give you two answers to that, Your Honor. First, just on that distinction between the Class 8 and larger and the Class 6 and 7 trucks, as to that, the district court made a factual finding, I believe, that there is no difference between them and their impact on bridges. And that is because even if you're taking the state's approach as correct, that we're looking at consumption of the bridges and kind of using up the bridges by injuring them as you travel over them, what matters is not the size of the vehicle. What matters is the weight per axle. And the state's own expert agreed with that. The district court made factual findings as to that. And so the Class 6 and 7 trucks caused just as much damage to the bridges as the larger trucks. Counsel, if I can ask you, I think this goes back to the question I asked Rhode Island's counsel, but what degree of deference should the court have paid to that legislative judgment? Because I think what Rhode Island is almost arguing is that almost there shouldn't have been a trial, that it's a pure rationality standard. So would it be rational for somebody on the street to speculate that Class 8 and above causes more damage? And if so, then that's that for the fair approximation analysis. So I guess I'm just wondering, again, that's such a key decision in this case, the legislature's decision to toll a Class 8 and above. What level of deference should that have received under the discrimination prong versus the fair approximation prong? I'll also give you two answers to that, John. It cannot be conclusive deference. I mean, certainly the legislature is entitled to whatever deference it is going to do in terms of the quality of its judgment. But the Supreme Court has made very, very clear in cases like old women's health and disabled communications that when there's a factual component to a constitutional question, the court has an independent constitutional duty to make its own judgments. It cannot simply defer to the legislature. But that's not the way the court's told us to go here when it comes to here you have a legislature. It's told that there are studies showing that the Class 8 trucks harm the pavement much more than the other trucks. And so it relies on that to just go aim at the bigger trucks that harm the pavement. Presumably they may harm more. I thought the Supreme Court has told us that's okay as long as it's not wholly irrational and that we should otherwise defer to the legislature. Again, I'll give you two answers to that. I think on the wholly irrational point, that cannot be the test. I mean, this Court said in the Traylor Bridge case that the fair approximation test asks, it's fundamentally a question of allocation. It asks whether or not this legislature has made a reasonable distinction between those that it's charging and those that it's not. If the test is one of pure rationality, as my friend suggests, that test adds nothing to the Constitution. Is it Evansville that tells us that the test is whether it's, at one point it says wholly irrational, at another point it says wholly unreasonable? Evansville does use that language. So why are we obligated to follow it? Well, I think when you look at what Evansville actually did, it engaged in a real factual inquiry. The Supreme Court after that in the Northwestern case engaged in a real factual inquiry, and it asked whether or not the entities that are using a facility are getting a benefit from it. And if they're not getting a benefit from it, then it's not reasonable to say that we're going to charge them. But if they are getting a benefit, it's reasonable to impose a charge if the distinctions that are being made are, you know, again, draw reasonable lines. And so I think— But, counsel, it seems to me that the very phrase fair approximation sort of suggests close enough. It doesn't have to be precise. If it's close enough to a reasonable distinction between the impacts of the categories we're talking about, that's probably good enough. But on this record, I mean, there was evidence quantified that the Class 8 trucks, not by a big margin perhaps, but they do have a more significant physical impact on the bridge structures than the Class 6 or 7 trucks. And the legislature used that quantification to distinguish between tolls imposed on the Class 8 and the Class 7 trucks. I mean, there is evidence in the record to support that judgment, is there not? I think not, Your Honor. I think that the study that you're referring to, the GAO study, it was actually not a study of bridges at all. It was a study of overweight trucks that were using highways. I think as to the evidence in the record relating to large trucks as opposed to smaller trucks, I think the evidence was quite clear that they imposed equivalent damage on the bridges because, again, what matters is the weight per axle. And small trucks have as much weight or more weight per axle than large trucks. I mean, the state's own expert agreed with that. He said there weren't as many small trucks as large trucks. Judge Smith made a very careful review of the evidence, and this, I think, is starting at the end of pages 57 and on, and he found that the state's own evidence suggested that there was no distinction between large and small trucks. Other evidence, which the judge regarded as more credible, suggested that, in fact, there were more small trucks than large trucks. And so the evidence in the record indicates that if that's the description we're looking at, kind of using up the bridge by frequent use and damage, that small trucks are identically situated to large trucks, and therefore it is not reasonable, it is not rational to have a rule that distinguishes between them. In fact, it entirely excludes small trucks from any towing at all. Counsel, I think that the record shows, and I am approximating here a little bit because I think the record wasn't precise, but when you looked at Class 8 and above, it was about 80% out-of-staters, 20% in-staters. Class 4 to 7 is 60-40. So if Rhode Island had taxed Class 6 and above, it's probably still going to be about 70% out-of-staters and 30% in-staters. Again, I'm approximating a little bit with the map, but I guess the question I have for you is, is the difference of 10% really a constitutional difference? In other words, even if they had done exactly what you proposed and what the district court thought made more sense, which is toll Class 6 and above, it still would have been tolling about 70% out-of-staters. So how can a 10% difference be a constitutional problem here? Well, I think I would distinguish the caps argument and the discrimination argument from the fair approximation question, which I think is what your question goes to. And fair approximation is not a discrimination inquiry. But I think it goes to both, right? I mean, the decision to toll Class 8 and above is important to both the discrimination analysis and the fair approximation analysis, isn't it? It is, yes. There are two elements of the discrimination argument. One is the caps. The other is the distinction between the large and small trucks. But I think that the large and small trucks are particularly important in the fair approximation inquiry because they were asking, is there a reasonable distinction between those that are tolled and those that aren't tolled? Again, not in a discrimination sense, but does this make sense? If they'd added more 6 and 7 trucks, then they would have increased the fees being paid by out-of-staters. I'm sorry? More out-of-state trucks would have been taxed. Well, if we're in the discrimination world, I think the question is... Right. We would care about that if there's competition between the two of them. But if there's no competition and we're looking at burden placed on interstate commerce, we'd actually increase the burden on interstate commerce if we added in 6 and 7 trucks. I think that that's not so, Your Honor. Well, wouldn't more trucks have to pay the fee from out-of-state? Well, I think, as with the caps, we're talking about the aggregate impact of the charge. And so there is a higher... It's designed so that a higher percentage of those that pay are out-of-staters than in-staters. And I recognize that at least potential competition is necessary for there to be commerce post-discrimination arguments, but I think that there is potential competition here. And Judge Smith did not say that there isn't. I think we're talking about a little bit past each other on what must be established, what kind of competition must be established. And, again, as to the large trucks, there is no question that the by-state trucks compete, whether they're in-state or out-of-state. Any further questions for counsel? Thank you. Great. Thank you, Your Honor. Thank you, counsel. At this time, would Mr. Gershengorn please introduce himself back on the record to begin? He has a four-minute rebuttal. Sure. Ian Gershengorn for Appellant State of Rhode Island. I want to make a couple of quick points on rebuttal. First, this question about whether you have to show competition and potential competition, I just want to read two things from Trailer Bridge, which I know, Judge Chiara, you're familiar with. As noted above, just because a facially neutral policy has an impact on out-of-state company, even exclusively so, it does not necessarily follow that the policy burdens commerce. General Motors v. Tracy. Thus, in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market, there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant commerce clause may apply. You have to show competition. What's your position on it? Let's put to one side for a minute the 6-7 and look at the caps. They apply to out-of-state trailers and they apply to in-state trailers. Do we need to have some more evidence, more than was presented in Trailer Marine, that there is presumably competition between those entities in-state versus out-of-state? Trailer Marine, if I understand Your Honor's question correctly, Trailer Marine and Shiner don't require an impact on competition because those are gates-at-the-border cases. No case has held that that applies in a situation not like that. Let me narrow the question. In this case here, can't we presume that there is competition between in-state tractor trailers and out-of-state tractor trailers? Absolutely not, Your Honor. Mr. Rothfeld, the result goes to potential competition. I urge the Court to re-judge Ms. Thurow's opinion. I don't see a discussion on it. I'm quite comfortable that the holdings on 87 and 88, those are the sum and substance of the competition findings. And so this idea that there's potential competition or presumed competition, I think what General Motors says, in fact, what Cherry Hill says, is exactly the opposite of that, which is you cannot presume that competition will exist. And, indeed, the findings were the opposite. No fleet changes, no diversion, no changes at all between in-state and out-of-state. Well, let me give you an example. In-state Rhode Island lawyers and out-of-state lawyers with multinational firms, can't we just presume there's some competition between them? Do I need a study to tell me that? You need to show a harm between them. That is what Cherry Hill says, Your Honor. No, do I need to? Can't I just assume there's some degree of competition? So I don't think you can assume some degree of competition. You cannot consume some degree of competitive harm. Not only does Cherry Hill say you have to do that and trailer bridge, but the court found there is none. But I also would really like to address this other question about the line between 7 and 8, because I think it's critical. First of all, Your Honor, with respect to the percentages, Doran says that only a few thousand Connecticut residents use these transponders. It was 90-some-odd percent. I don't know the exact, 98%, 99%? And the court said, No problem. It is open to everybody on exactly the same terms. Second, the question here is, like the district court, the legislature found that 70% of the damage was being done by the big trucks, and that's who they told. They told the biggest trucks causing the most damage. That's the line they drew. Now, the district court took issue with that, one, for the reasons Judge Lopez said, which I think is, I just don't even understand, that they had to base it on bridge crossings, not consumption of the bridge. That seems to me firmly at odds with Economics 101 concepts of depreciation. But second, there was study after study. So the district court said, Well, ESAL studies, those are pavement. That's not a good enough analogy. The fatigue study, eh, there were other things he should have thought about. HCAS is what he should have used. That's fine, but it cannot be that the Constitution requires HCAS instead of ESAL and fatigue studies, right? That's why I was wondering earlier what level of deference you're saying applies, and when you say it's pure rationality, I think that's the phrase you use. Are you saying that there shouldn't have even been a trial on the fair approximation here? So I think it's pure rationality on the fair approximation, but that doesn't mean deference goes away completely on the discrimination. No, I'm asking about fair approximation. Are you saying there shouldn't have even been a trial? There could be a trial, but the question at trial is not who was right. The question at trial is was the legislature wholly unreasonable in relying on those studies. That's the question that should have been at trial, and that's the question the judgment never answered, and that's the critical thing here. And I'll close with two small points on this line. First, Rhode Island truckers have opposed this legislation at every stage and every form. If you think it benefits them, they're surprised by that. And second, just to close on a small point, this idea that 80 percent are out of state and 20 percent are in state, so it must be okay, think about how that affects small states like Rhode Island. In California, the numbers would be completely different. It cannot be that the Constitution would permit this scheme in California where the ratios between in-state and out-of-state truckers would be different than it does in Rhode Island just because Rhode Island is small. I do have one more question, if I might. This will not allow you to end on a high note, I guess, but I apologize for that. We've been talking about the relevance of evidence of discriminatory purpose, discriminatory intent. There is a lot of evidence in this record that the distinction between Class VIII and Class VII really had very little to do with the difference in physical impact on the structure. There's a lot of evidence that it was designed to placate local business interests who felt they would be severely hurt if this toll applied to the class of trucks that they used. So in making a judgment about how reasonable the judgment was between Class VII and Class VIII, doesn't that evidence sort of affect the credibility of the legislative determination? Yeah, there's evidence in the record that there's a different physical impact, but the real reason for it was protecting local interests. Isn't that important for us to consider? So, Your Honor, you can consider it, but it doesn't change the outcome here for a couple of reasons. So, first of all, there is no evidence in the statements that were quoted that there was an effort to benefit in-state businesses at the expense of out-of-state businesses. And so the fact that the legislature says that they're adopting something because it helps local residents but doesn't harm competition is something legislatures do every day. Second, I really have to take issue with the idea that the only difference between VII and VIII was that locals might care about it. The legislature found that 70 percent of the damage was being done by these Class VIII and above, Class VIII, IX, X, XI, XII, and XIII trucks. And so, no, I don't think that Your Honor can look at the fact that it benefits and say that's enough. And I think Doran, again, is the perfect example. Remember, Doran originally applied only to Massachusetts residents. Then the Globe wrote an article and said you can't do that. And so they changed it to let everybody in so a couple of thousand Connecticut folks were able to participate, too. There was no doubt about who was benefiting from that. There was no doubt about who the legislature was trying to benefit from that. I think you've answered the question. Thank you, Your Honor. We ask you to reverse. Thank you, counsel. That concludes arguments for today.